# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5702 | **DATE** | 3/29/2001 |
| **CASE TITLE** | | Santelli vs. Electro-Motive | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The motion for summary judgment is granted in part and denied in part. Summary judgment is granted on Santelli's sec discrimination claims relating to testing and training, as well as her retaliation claim, as Santelli has failed to contest EMD's arguments. Summary judgment is denied as to Santelli's claim that the transfer, work assignment, and removal from welding in October 1995 constituted sex discrimination. Trial is set to 9/4/01 at 10:00 a.m. Pretrial order is due 7/6/01. Pretrial conference set to 7/26/01 at 3:00 p.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

MAR 3 0 2001

date docketed

docketing deputy initials

date mailed notice

**Document Number**

116

OR courtroom deputy's initials

01 MAR 29 PM 2:40

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARY C. SANTELLI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 97 C 5702 |
| | ) | |
| | ) | |
| ELECTRO-MOTIVE, a division of | ) | |
| GENERAL MOTORS CORP. | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
MAR 30 2001

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Mary Santelli is a welder who claims that her employer, Electro-Motive (EMD), a division of General Motors, discriminated against her in the terms and conditions of her employment because she is a woman and retaliated against her because she had previously complained about sex discrimination. EMD has moved for summary judgment, claiming that Santelli experienced the "same disappointments as many of her male counterparts." For the reasons stated below, the motion for summary judgment is granted in part and denied in part.

### Background

EMD first hired Mary Santelli as a welder on May 22, 1972.[1] EMD's plant in LaGrange, Illinois manufactures locomotive engines. Although she was laid off in 1985, Santelli returned to

---

[1] EMD argues in its Reply Brief that Santelli has failed to comply with Local Rule 56.1. It is obvious that Santelli's Response Brief does not reply to each numbered paragraph of EMD's Rule 56.1(a)(3) submission, but the substance of her brief adequately addresses the facts that Santelli disputes.

the plant in 1991 as a clerk. In 1993, she began testing for placement in one of the two welding job classification codes: W51 and W52. Of the two codes, the W51 classification requires a higher skill level and results in a higher salary. In fact, it is the highest paying job classification in the LaGrange plant.

The test for the welding classifications requires an applicant to weld satisfactorily either six test plates (for the W51) or three test plates (for the W52). After an applicant welds the test plates, the plates must pass both a visual and laboratory inspection. The visual inspection is performed by an EMD Tester, while the laboratory inspection is done by an EMD Engineer. EMD claims that test plates are recycled after the pass/fail determination is made, as storage space does not allow for keeping the used test plates. Once a welder passes and is certified as either W51 or W52, the Employment Division decides on the appropriate placement for the welder.

In November 1993, Santelli took the easier W52 test. Although she had previously worked as a welder, the collective bargaining agreement in effect at EMD provided for retesting of welders who had not worked as welders for six months. She spent two days either practicing or testing but failed two of the three parts of the test. One of the testers, Eph Edwards, asked her in that month, "Why do you want to be a welder? Don't you like being a clerk? It's a woman's job." According to Joe Ball, a union representative, EMD Supervisor[2] Ivan Ivanov found out sometime in 1993 that Charles Patton had failed the welding test. Ivanov nonetheless allegedly found a welding job for Patton. Santelli however, remained in a clerk's position after failing the W52 test.

On January 5, 1994, Santelli began preparing for the harder W51 test, using as many test

---

[2] The record reveals that EMD had previously used the term "foreman," but at some time it substituted the term "supervisor." Both the terms are nonetheless used throughout both parties briefs, and the Court assumes for the purposes of this opinion that they are synonymous.

plates as she could during the 48 hours of training and practice time allotted her over several days. On January 13, 1994, Santelli failed four of the six parts of the W51 test. The examination of the test plates from this test was conducted by EMD Tester Don Hinson and EMD Engineer Richard Jasper. Of the four test plates that Santelli failed to weld properly, Jasper determined that one failed the laboratory examination, while Hinson failed the rest on visual inspection. Around this time, Santelli claims that Supervisor Ivanov told her that she would not be a welder because welding was "too difficult for a woman."

After failing the W51 test, Santelli was placed in the W52 code from January 13 to February 16, 1994 for on-the-job training. She therefore received approximately a month's training in welding at the W52 level. On February 16, Santelli retook the portions of the exam that she had previously failed. She got credit for those plates that had passed in January and November, but she still failed the three-plate W52 exam. Santelli admitted at her deposition that she made mistakes on the General #1 test plate, but she still believes that she passed this exam. EMD destroyed the test plates after examining them. Santelli claims that around this time EMD Tester Don Hinson told her that she would "never weld again" and that her failure to pass the exam might be a blessing in disguise because welding is too hard for a woman.

On March 7, 1994, Santelli was moved out of welding and into a G-91 (general factory) position. The next day, EMD switched her to a night shift. The day after that, Santelli filed her first complaint with the Illinois Department of Human Rights. In that complaint, she cited the failed February 16 welding test. She stated that she was the only female welder at EMD, that male welders had been allowed to remain in welding positions despite failing the welding test, and that some had never been required to take the test. Also, she alleged that several male welders passed only part of

the test and were placed in production welding, or they were allowed to retake the test after a three-week training period. In her charge, Santelli singled out Don Hinson, Eph Edwards, and Ivan Ivanov as management officials who told her that she "would not be a welder because it was too difficult for women." She also alleged that William Donalds, an EMD superintendent, told her that the company had lost her test plates, thereby preventing her from examining them to see how she had erred.

From around April 1994 to the following January, Santelli took medical leave, first for tendinitis and then for major surgery (a hysterectomy) and job-related stress. Santelli returned to EMD on February 2, 1995, and she began full-time training for another welding test. On February 21, 1995, Santelli passed the harder, six-plate W51 test. She claims that EMD Tester Hinson told her that it was a "fluke" and required her to retake the test. She passed again. On February 22, 1995, Santelli was promoted to W51 welder and assigned to Department 7013. This department welded small crankcase engines. The welders in Department 7013 had to lift 65-pound coils of welding wire. Santelli had her male colleagues lift the coils for her. Loading the coils for Santelli took them five minutes every other day.

Santelli worked as a W51 welder in Department 7013 for eight months. Her work was considered satisfactory despite the fact that she could not lift the 65-pound coil. On March 24, 1995, she met with a number of supervisors (Legan, Lane, DeLeon, and Talbert, along with Joe Ball, her union representative) to discuss her welding. She told them that she was doing the welding, but that her coworkers were installing the welding coils and tightening clamps on the crankcases. The supervisors transferred her to another W51 job in Department 7013, but she demonstrated that she could perform the tightening of the clamps. Even without being able to lift the welding wire, Santelli

4

was reassigned to her original W51 position.

In October 1995, Santelli was transferred out of Department 7013, where she had been working on the first shift. EMD claims that this transfer was part of a reduction-in-force (RIF)[3] in that department and notes that three male welders were transferred out at the same time. EMD asserts that its policy when a department RIF takes place is to reduce those employees with the lowest plant-wide seniority.

Santelli flatly asserts this articulation of EMD policy is false. She presents manpower sheets for several weeks in October 1995 which identify the employees in Department 7013. Plaintiff's Resp. Br., Exh. 2. The manpower sheets appear to refute EMD's articulation of its seniority policy. If EMD actually made personnel decisions based on the plant-wide seniority of workers within the particular departments, it would have started by transferring and laying off some of the seven Department 7013 W51 welders who had later seniority dates than Santelli. W51 welders Garcia, Marin, Martinez, Aguirre, Gonzalez, Alvarez, Ramirez all worked the second shift in that department and had plant-wide seniority dates from 1994, making them eighteen years less senior than Santelli. Regardless of that fact, EMD reduced Santelli and, it appears, none of those Department 7013 W51 welders. In fact, Vincente Aguirre transferred to the first shift from the second shift. EMD seems to hint, *see* Defendant's Reply Br. at 11, that the RIF was somehow shift specific, but it has made no effort to provide evidence explaining why Department 7013 welders with 1994 seniority dates remained in the department when Santelli, with a 1972 seniority date, was transferred out.

From Department 7013, Santelli was transferred to to Department 7021. Santelli has

---

[3] The collective bargaining agreement between EMD and the United Auto Workers allows for a RIF whenever "a reduction in production schedules makes it necessary to layoff employees."

described this as the "most demanding and dangerous welding position in the company," and it certainly sounds formidable. In that department, she worked on "B-29" crankcases, which are enormous locomotive parts that must be secured to a fixture. The huge crankcases, each weighing several tons, are secured to the fixture via large clamps and bolts that must be tightened down using an impact gun or wrench. The crankcase is then lifted off the ground by the fixture and maneuvered into different positions so that the welder can access various points. W51 welders work around the B-29 crankcase and also stand on an elevated platform to reach certain spots. "Strongbacks" must be hoisted up to 15-foot platforms and attached to the ends of the crankcase to assist the welding.

Not all welders in Department 7021 worked on the B-29 crankcases. EMD asserts that Santelli's foreman, Tony Roberts, assigned Santelli to the B-29 crankcases because she had the lowest seniority date in the department. Santelli points out that three W51 welders had lower seniority numbers than her, but at least one was not assigned to B-29 welding. Plaintiff's Response at 9 & Ex. 2. The manpower roster for the week ending October 22, 1995 shows that Nicolas Garcia had a seniority date of June 25, 1974, James Blotnicki had a seniority date of July 10, 1974, and Antonio Mosivais had a seniority date of September 26, 1994, all later than Santelli's May 22, 1972 seniority date. Garcia did not work on the B-29 crankcases.

Santelli points out that EMD Superintendent Danny Legan stated in his deposition that department supervisors are "empowered to run their department as they need to run it," including on what and where employees work within each department. That suggests that EMD actually had no policy that required Roberts to assign the lowest-ranking W51 welders in Department 7021 to work on the B-29 crankcases.

When Santelli protested her assignment to B-29s, Roberts told her "You want to be treated

6

equally, don't you?" and "You don't want me to discriminate, do you?" She accepted her assignment and started work. Just as in Department 7013, certain aspects of the B-29 work were beyond Santelli's physical capabilities. She could not lift the crankcase onto the platform and could not secure the bolts with a power drill (her fingers were too small for the trigger). She could not carry up to the 15-foot platform the coils of welding wire which needed to be replaced every few days. According to her affidavit, welding a B-29 took eight hours, while installing the "strongbacks" took five minutes per eight hours and mounting the welding wire took five minutes every other day. Santelli had no difficulty with the welding.

Unlike in Department 7013, however, Santelli's difficulty with lifting heavy objects was not tolerated in Department 7021. After one week working on B-29s, Santelli requested a transfer back to Department 7013. To increase her chances, she requested a shift change in an attempt to bump one of the less senior welders mentioned above who was working on the second shift in Department 7013. Santelli was transferred to the second shift but was not allowed to change departments.

On October 23, 1995, Roberts removed Santelli from her W51 position under a procedure called "Red 618." A Red 618 is essentially a finding by a supervisor that an employee is unqualified. (It is unclear whether it means the employee is unqualified for a work assignment or unqualified for a classification code regardless of assignment). Roberts justified this action by noting that Santelli could not attach the "strongbacks," use the power drill, or load the welding wire. The first of those two tasks were specific to the B-29 work, but the last is common to all W51 welding jobs. Santelli could not load the welding wire in either Department 7013 or 7021, although this alleged deficiency, as we have noted, was apparently not a problem for the eight months that she had welded in Department 7013 as a W51 welder. Santelli's supervisor at the time of the Red 618, Warren

7

McGrew, allegedly handed her a broom and asked her, "I wonder if you can handle sweeping? It's a girl thing." Santelli has cited seven instances where she claims that a male welder received preferential treatment, either by being permitted to work for years as W51 welders without passing the welding test, or by being allowed to continue welding in the W51 code after receiving a "Red 618." Plaintiff's Ex. 8.

Santelli was returned to the G-91 general factory work code on October 31, 1995, and her pay was reduced. On that same day, she filed a second EEOC charge. In the charge, Santelli stated that she was "placed in welding duties which were very demanding and I believe this was done in an effort to frustrate me in giving up the position." The form reveals that she claimed that the discrimination took place on October 23, 1995 (the day of the Red 618). She also denied that she had told her EMD supervisor that she was physically unable to do the job. On the charge form, the "Retaliation" box is checked, but her comments on the form also included as one of the reasons for her belief that she had been retaliated against the statement that "I am the only female in the welding position."

On November 13, 1995, Santelli transferred to Department 3116 as a lower-paid W52 welder. She worked there until May 13, 1996, when a RIF sent her back to the G-91 code. She was the welder with the lowest plant seniority in Department 3116 at that time.

In September 1996, Santelli needed time off to spend with her disabled brother and sick father, so she took personal leave, vacation time, and a voluntary deferred layoff. This layoff was planned to last until January, 1997, but EMD recalled her to work in the G-91 code on October 28, 1996. She started work in Department 2022.

Santelli took family medical leave in April and May 1997 and then worked at EMD as a W52

welder. On May 16, 1997, she received a right-to-sue letter from the EEOC covering both her 1994 and 1995 complaints. She took and passed a W52 welding test, as well as a pipe welding test on June 5, 1997. This test was administered by Trancito Amador.

After receiving her EEOC letter, Santelli filed a *pro se* complaint in this Court on August 17, 1997, alleging that she "was deprived of higher welding classification and work opportunities based on defendant's contention that she/I was not physically fit to perform that type of work." She worked in the W52 code until October 21, 1997, when she was bumped down to G-91 again by a more senior welder.

Santelli returned to the W52 code on November 10, 1997, when she began working in Department 3116 again. She filed an Amended Complaint with the assistance of counsel on November 17, 1997. Count I alleges sex discrimination in that EMD (1) derided her desires to be a welder, (2) subjected her to disparate treatment in testing in that male welders were allowed to work as welders without passing the test, and (3) removed her from a welding classification and directed her into a "girl's job." Count II alleges retaliation in that EMD (1) placed her in the most dangerous welding position when less senior male welders should have been assigned to that position, and (2) removed her from that position and subjected her to improper shift transfers.

Santelli has introduced affidavits from other welders. Plaintiff's Resp. Br., Exhibits 3-5. Joe Ball was the UAW committeeman for all W51 welders. Charles Taylor is a W51 welder who worked with Santelli. David Reason is currently a W51 welder at EMD. Ball, Taylor and Reason all stated in their affidavits that it was "obvious" that Santelli was being treated differently than men. They claim that male welders (both W51 and W52) were routinely reassigned to other welding jobs if they had problems with a particular position and that male welders received lifting assistance from

co-workers but were not removed from welding. In addition, Danny Legan, EMD General Supervisor of Materials, stated at his deposition that EMD encourages teamwork and suggested that employees assist each other with lifting objects. Furthermore, Ball, Taylor, and Reason all stated in their affidavits that the practice at EMD was to make employment decisions based on plant-wide seniority, not department-wide seniority.

### Legal Standard

In considering whether there are genuine issues as to any material fact, the Court is required to consider all evidence (including pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits) and draw all reasonable inferences in favor of Santelli, the non-moving party. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In employment discrimination cases, this standard is applied strictly, as these cases often involve credibility determinations that are best reserved for a jury. *See Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1162 (7th Cir. 1994).

To prove discrimination, Santelli may proceed under either the direct or indirect method. The direct method requires her to produce sufficient evidence, either direct or circumstantial, to create a triable issue as to whether her sex was a motivating factor in her discharge. *Marshall v. American Hospital Association*, 157 F.3d 520, 525 (7th Cir. 1998). At least so long as they concern the employment decision in question, *see Huff v. Uarco, Inc.*, 122 F.3d 374, 384-85 (7th Cir. 1997), statements by the decisionmaker are direct evidence of discrimination because they "relate to the motivation of the decisionmaker responsible for the contested decision." *Cheek v. Peabody Coal*

*Co.*, 97 F.3d 200, 203 (7th Cir. 1996).[4] "Remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999) (quoting *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997)).

To succeed under the indirect method of proving discrimination, Santelli must meet the requirements laid down by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* and later cases have "'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases'" involving indirect proof. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)).

Under the indirect-proof method, Santelli must first make out a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To do this, she must come forward with evidence from which a jury could conclude that (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside of her protected class more favorably. *Stockett v. Muncie Indiana Transit System*, 221 F.3d 997, 1001 (7th Cir. 2000). Santelli's evidence on these factors need not be overwhelming or even destined to prevail; rather, she needs to present only some evidence from which a jury could infer that EMD discriminated against her because of her sex. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000). This standard is a flexible standard

---

[4] Statements of the decisionmaker that are not directly related to the challenged decision may nonetheless constitute evidence of pretext under the indirect method of proof. *See, Huff*, 122 F.3d at 385.

that is not intended to be rigidly applied. *Wohl v. Spectrum Manufacturing, Inc.*, 94 F.3d 353, 359 (7th Cir. 1996) (quoting *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995)).

If Santelli meets her burden of making a prima facie case, the burden shifts to EMD to produce evidence that Santelli was demoted because of a "legitimate, nondiscriminatory reason." *Reeves*, 530 U.S. at 142. EMD's burden is light, as it merely has to produce a reason, not persuade the trier of fact that it was motivated by factors unrelated to Santelli's sex. *Id.* Once this legitimate reason is articulated, the presumption of illegal discrimination that arose from Santelli's prima facie case disappears. *Id.* at 142-43 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 (1993)).

The ultimate burden of persuading the trier of fact that EMD illegally discriminated falls on Santelli's shoulders. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). At the third stage of the *McDonnell Douglas* framework, Santelli bears the burden of showing that the legitimate non-discriminatory reason proffered by EMD is a pretext for sex discrimination. *Reeves*, 530 U.S. at 143. In addition to any pretext evidence offered by Santelli, this Court may rely on the facts and inferences relating to the prima facie case. *Burdine*, 450 U.S. at 255.

If Santelli can make her prima facie case and provide evidence from which a jury could conclude that EMD's reasons are pretextual, this Court can rely purely on that evidence to find that a jury could reasonably infer that EMD discriminated against Santelli. That is the central holding of the Supreme Court's recent decision in *Reeves v. Sanderson.* Justice O'Connor, writing for a unanimous court, reversed the Fifth Circuit, which had held that discrimination plaintiffs must produce a prima facie case, persuade the factfinder that the employer's reasons were pretextual, and then produce even more evidence of discriminatory intent. The *Reeves* court held that the "Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional

12

discrimination through indirect evidence." *Id.* at 146. If Santelli can produce evidence of a prima facie case, and produce evidence from which a reasonable jury could find that EMD's stated legitimate, non-discriminatory reason is pretextual, this Court need not require her to produce even more evidence. To do so would convert the indirect method into an exercise in futility, as it would amount to an inconsistent requirement for direct evidence after exhaustive examination of all the indirect evidence. "[A] prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability," and requiring plaintiffs to "always introduce additional, independent evidence of discrimination" would be error. *Id.* at 149.

## Analysis

With this understanding of the burdens on each party, we turn to Santelli's claims. In her Complaint she asserted two disparate treatment claims: sex discrimination (Count I) and retaliation (Count II). At that stage, she claimed that she had been discriminated against in the terms and conditions of her employment because she is a woman, specifically in training, testing, transfers, and removal from welding. Further, she argued that EMD retaliated against her in transferring her into Department 7021, assigning her the most difficult work, and then removing her from welding entirely.

In its motion for summary judgment, EMD argues that Santelli failed to exhaust her administrative remedies; that her sex discrimination claims regarding training, testing, transfers, work assignments, and removal from welding fail the *McDonnell Douglas* test; and that her retaliation claims fail for lack of causation in that her supervisors were never aware of her 1994 administrative charge of discrimination.

In response to EMD's motion for summary judgment, Santelli apparently concedes most of

13

her claims. Her brief responds to one of EMD's arguments regarding her alleged exhaustion of administrative remedies and argues that her sex discrimination claims of transfer, work assignment, and removal from welding have raised genuine issues of material fact. Nothing is clearly stated regarding her other sex discrimination claims (training and testing), and not a word is offered in support of her retaliation claim. Santelli bears the burden of showing genuine issues of material fact on all her claims, and her failure to press these claims in her response brief is fatal to them.

She does not concede, however, what she now calls the "key issues" in her lawsuit: the discriminatory transfer to Department 7021, Supervisor Roberts' assignment of Santelli to the difficult B-29 work, and Santelli's removal from the W51 welding classification. She argues that these claims were raised in her EEOC charge and that they constitute disparate treatment because she is a woman.

*Exhaustion of Administrative Remedies*

EMD argues that Santelli's 1994 administrative charge was limited to training, testing, and placement of welders in 1993 and 1994. EMD therefore invites this Court to bar Santelli's claim that she was treated differently in the terms and conditions of her employment because of her sex. Given that Santelli is pressing only her sex discrimination claims regarding the transfer, work assignment and removal from welding, we need not decide whether she exhausted her administrative remedies on the training and testing sex discrimination claims. Her remaining sex discrimination claims, however, are not barred by a failure to exhaust administrative remedies.

Santelli can sue under Title VII for those claims that were included in her administrative charge. *Cheek v. Western & Southern Life Insurance Co.*, 31 F.3d 497, 501 (7th Cir. 1994). The law recognizes that these forms are often filed out by laypersons without the assistance of expert legal

14

counsel. Accordingly, Santelli need not allege each and every fact that combines to form the basis of each claim in her complaint. *Id.* She may also pursue claims based upon assertions not included in the administrative charge, as long as they are "like or reasonably related to the allegations of the charge and grow[ ] out of such allegations." *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc) (*quoted in Cheek*, 31 F.3d at 500). The test of *Jenkins* "is satisfied if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of the EEOC investigation of the allegations in the charge." *Cheek*, 31 F.3d at 500.

Santelli claimed in her 1994 charge that certain supervisors (Hinson, Edwards, Ivanov and others) told her that she would never be a welder because of her sex. She believed that they were frustrating her attempts to qualify for a welding position because of her sex, specifically by requiring her to test while allowing male welders to work without passing the test and by falsifying the test results to show that she failed. She also stated that she had been treated differently than other similarly situated male welders. Her charge therefore could serve as the necessary condition precedent to her training and testing claims. But we have decided that those claims have been conceded by Santelli. Her surviving claims about October 1995 actions might be "reasonably related" to her 1994 charge given that she alleges that at both times EMD sought to deprive her of a welding job, either by denying her entry or manufacturing her demotion. However, her surviving claims cannot meet the second half of the *Cheek* test; one would not reasonably expect an investigation of the 1995 events to grow out of an investigation of a charge made in 1994. *Cheek*, 31 F.3d at 500.

EMD also asserts that Santelli's 1995 charge relates only to retaliatory removal from a

welding position in October 1995. We disagree. Santelli claimed in her 1995 charge that after she had qualified as a welder EMD placed her in welding duties which were very demanding as part of a campaign to force her to give up welding. Santelli did not check the box marked "Sex," but the Seventh Circuit has allowed plaintiffs to raise claims in federal court, even though they did not check all of the appropriate boxes on their EEOC charge forms, so long as the factual narrative on the charge form refers to the type of discrimination later raised in the litigation. In *Jenkins*, a black woman filed an EEOC charge on which she had checked "Race or Color," but not "Sex," 538 F.2d at 168-69. She subsequently sued for race and sex discrimination. The *en banc* court held that she could pursue her claims of sex discrimination, given that her remarks on the form had included the statement that a supervisor had "accused [her] of being the leader of the girls on the floor." *Id.* at 167. *See also E.E.O.C. v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 640 (N.D. Ill. 1988) (noting that although only the "Race" box was checked, the remarks on the charge form implied "discrimination against both women and blacks as two separate classes.").

Santelli's remaining claims satisfy the requirements of *Jenkins* in that in her October 1995 charge, she referred at least indirectly to her removal from Department 7013 and directly referenced her assignment to B-29s and her later removal from welding. She also made the statement that part of the basis for believing the law had been violated was that "I am the only female in the welding position." These remarks made it reasonably clear that she was not alleging just retaliation but also sex discrimination.[5] Accordingly, she has exhausted her administrative remedies with regards to

---

[5] EMD argues that this Court previously viewed the scope of Santelli's 1994 and 1995 charges more narrowly. *See* August 13, 1999 Memorandum Opinion and Order. However, that decision merely denied Santelli's motion to compel documents relating to the recall of welders from 1991 to 1993, as her charges only alleged discrimination from November 1993 onwards. We did not address whether she exhausted her administrative remedies.

16

those claims that she continues to press.

*Discriminatory Transfer into Department 7021*

The first preserved claim pressed by Santelli in response to EMD's motion is that EMD discriminated against her by moving her out of Department 7013 into Department 7021. Santelli has no direct evidence that the October 1995 RIF was discriminatory, so she must proceed under the indirect method. With regards to the prima facie case, no one disputes that she belongs to a protected class. She must show that she was meeting EMD's legitimate expectations, that she suffered an adverse employment action, and that similarly situated males were treated more favorably. *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001).

Santelli worked for eight months as a W51 welder in Department 7013 with no complaint by EMD. The company even deliberated about her difficulties with the position and then explicitly allowed her to work for another six months even though she could not lift the 65-pound coil of welding wire. Santelli was meeting EMD's legitimate expectations in Department 7013.

With regards to the adverse employment action element, EMD points out that Santelli's transfer from Department 7013 to Department 7021 did not include demotion from the W51 welding code, nor any decrease in pay or benefits. However, "[o]ne does not have to be an employment expert to know that an employer can make an employee's job undesirable or even unbearable without money or benefits ever entering into the picture." *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987). The *McDonnell Douglas* framework must be applied flexibly, *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999), and this Court finds that transfer to the most difficult welding work at the plant can constitute an adverse employment action.

Santelli has provided evidence from which a jury could conclude that similarly situated male

17

welders were treated more favorably in the RIF. Specifically, Santelli has noted that no less than seven W51 male welders in Department 7013 with *less seniority* than she had accrued were apparently not reduced out of Department 7013. Accordingly, she has met her burden of showing a prima facie case.

EMD proffers a legitimate, non-discriminatory reason for Santelli's transfer, claiming that the reduction out of Department 7013 followed standard, nondiscriminatory policy based on the plant-wide seniority of workers within Department 7013. As demonstrated above, Santelli hotly contests this issue and raises questions about the nature and scope of EMD policies with regards to RIFs and employee transfers. However, EMD's burden is merely one of production and it has met its burden.

Santelli bears the burden at the third and final stage of *McDonnell Douglas* of providing evidence from which a reasonable jury could conclude that EMD's articulation of policy is merely a pretext for intentional discrimination. Her argument is that the "RIF was a sham." She points out several reasons to doubt EMD's articulation of its policy, including the fact that Santelli was transferred despite being senior to other W51 welders, as well as the statements by Plant Superintendent Danny Legan that department supervisors are empowered to run their departments as they see fit, including who works where and on what.

The Court finds that this same evidence would permit a trier of fact reasonably to infer that EMD's explanation for Santelli's transfer is a pretext for intentional discrimination. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147 (noting the "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty

about a material fact as 'affirmative evidence of guilt.'") (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

Santelli has produced a prima facie case and shown pretext sufficient to preclude summary judgment on the transfer claim. We note, however, that a trier of fact is not compelled as a matter of law to find for either party at this stage. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148. This case, however, is not one of those instances. Summary judgment is denied on the transfer claim.

*Discriminatory Work Assignment*

Santelli also claims that Tony Roberts forced her to weld B-29 crankcases in Department 7021 because she is a woman. When she protested and requested a transfer, Roberts allegedly stated to her, "You don't want me to discriminate, do you?" and "You want to be treated equally, don't you?" These statements made by the decisionmaker at the time of the allegedly discriminatory action are ambiguous on their face. A rational trier of fact reasonably could find from those statements that Roberts was motivated by hostility to female welders, although it is by no means an easy call. However, a jury's deliberation of these delicate questions of motive and intent, regardless of their ultimate answer, will be a more reliable guideline than this Court's review of the dry papers submitted thus far, particularly given that a jury will be able to examine Roberts' demeanor and gauge his veracity when he attempts to explain or deny those words at trial.

*Discriminatory Removal from Welding*

Santelli claims that removing her from the W51 classification under the Red 618 procedure

was intentional discrimination against her because she is a woman. Without direct evidence, she must proceed under the indirect method, where again no one disputes that she is a member of protected class. In this instance, she need not argue that removal from the W51 code was an adverse employment action.

However, Santelli must still show that she was meeting EMD's legitimate employment expectations and that similarly situated male welders were treated differently. EMD claims that Santelli could not perform the necessary tasks of the B-29 work in Department 7021. Santelli stated at her deposition that the lifting was "guy's work" and that she relied on the male welders to help her with those duties. EMD has also shown that Santelli could not lift the "strongbacks," nor could she use the power wrench to attach the bolts, as her fingers were too small. However, framing the issue that narrowly is too stingy a standard, as Santelli was removed from the W51 code, not just the B-29 work in Department 7021. And we think a trier of fact reasonably could infer two things from the eight months that she worked in Department 7013 as a W51 welder without lifting the 65-point coil of welding wire: first, that meeting the requirements of the W51 code did not absolutely mandate the lifting of the coil, and second, that Santelli was otherwise qualified to work as a W51 welder. Santelli claims that she had no problems with the welding of B-29 crankcases, and EMD does not dispute this. Accordingly, we find that Santelli has provided evidence from which a reasonable jury could conclude that she was meeting the legitimate expectations of her position as a W51 welder.

Santelli must also show that similarly situated male welders were treated more favorably. Santelli points to Willie J. Irons, with a seniority date of March 30, 1966, as an example of a W51 welder who received Red 618 sanctions in no less than four departments. EMD Admission 56. Santelli asserts that this shows that Irons was moved from department to department while staying

in the W51 code and was not removed from welding altogether on the first Red 618 as she was. Charles Reddus, with a seniority date of February 5, 1974, was removed from Department 4151 with a Red 618 but allowed to work in another department as a W51 welder. EMD Admission 67. Furthermore, Santelli has introduced affidavits in response to the motion for summary judgment indicating that EMD routinely transferred welders experiencing problems to different assignments rather than removing them from welding entirely. *See* Ball, Taylor, and Reason Affidavits, Plaintiff's Resp. Br. Exh. 3-5.

EMD responds by pointing to several male welders who were removed from welding entirely under the Red 618 procedure, including Joseph Medrano, Ivory Mayo, Herman Mangus, Donald Gliege, and James Ranceful. Some of the personnel records produced by EMD, however, actually support Santelli's contention, in that Donald Gliege received a Red 618 twice without being removed from welding. On August 30, 1993, he transferred to Department 6172 as a W52 and on September 5, 1993, he transferred to Department 7013 as a W51. Defendant's Counter-Statement of Undisputed Facts Exh. A at D 01794.

EMD also cites to *Lindale v. Tokheim Corp.*, 145 F.3d 953 (1998), as authority that requires summary judgment in its favor. In *Lindale*, the plaintiff was hired as a mechanical engineer in the lowest grade (ME I). Her husband had nearly identical qualifications, but was hired into a higher grade of mechanical engineer (ME II). After 22 months the plaintiff was never promoted. As the court analyzed the plaintiff's comparative evidence this was all she had. *Id.* at 957. But the court held that plaintiff's husband was not similarly situated to her and it noted that other undisputed evidence showed that "[a]nother male ME I had to wait 30 months to be promoted, and no other males were promoted in fewer than 23 months." *Id.* The court concluded that plaintiff's "weak" and

"sparse" evidence could not by itself support an inference of discrimination. *Id.*

In this case, by contrast, Santelli has produced evidence showing that W51 welders were given a Red 618 but nonetheless allowed to remain as welders. EMD has responded with evidence that numerous male welders were removed from welding with a Red 618. We believe a jury could conclude that these persons were similarly situated to Santelli. Thus *Lindale* does not control the outcome here.

EMD's reliance on *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 932 (7th Cir. 1993) is likewise unavailing. There, a perennially absent black employee attempted to rely on evidence that white employees were not discharged for similar conduct. The court noted that "[w]hen a worker gives ample cause for discharge, as Bush did, his effort to defeat summary judgment by pointing to worse workers of a different race who were not fired is easily parried by pointing to instances of better workers of a different race who were also fired or worse workers of the plaintiff's race who were retained." *Id.* EMD argues that the same is true here, as there were male welders who were, like Santelli, removed from welding. But this case is different from *Bush* in that there it was unquestioned that the plaintiff had done things that objectively gave rise to a legitimate cause for the employer's actions; here Santelli is attacking the employer's claim that receipt of a Red 618 actually provided a basis for the employer's actions. In addition, she is challenging the underlying basis for the Red 618. Under the circumstances, her comparative evidence is, unlike in *Bush*, sufficient to permit a jury to conclude that she was discriminated against based on her sex.

EMD asserts that its legitimate, non-discriminatory reason for removing Santelli from welding was that she was not qualified. EMD cites Roberts as saying that Santelli told him that she couldn't do the job. Santelli denied this in her 1995 charge, as well as in her briefs before this Court.

Just as with the legitimate expectations element of her prima facie case, however, this Court finds that a trier of fact could reasonably infer from her eight months of Department 7013 W51 work that Santelli was qualified as a W51 welder. Accordingly, it could be reasonably inferred that citing alleged deficiencies in her B-29 work in Department 7021 as a justification to remove her from the W51 code entirely is merely a pretext for intentional discrimination. Summary judgment on the removal claim is denied.

### Conclusion

The motion for summary judgment [99] is granted in part and denied in part. Summary judgment is granted on Santelli's sex discrimination claims relating to testing and training, as well as her retaliation claim, as Santelli has failed to contest EMD's arguments. Summary judgment is denied as to Santelli's claim that the transfer, work assignment, and removal from welding in October 1995 constituted sex discrimination. The case is set for trial on September 4, 2001 at 10:00 a.m. The final pretrial order is due July 6, 2001. The case is set for a final pretrial conference on July 26, 2001 at 3:00 p.m.

Dated: March 29, 2001

MATTHEW F. KENNELLY
United States District Judge